# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| City of Philadelphia | : | |
| | : | |
| v. | : | No. 1953 C.D. 2016 |
| | : | Argued: October 17, 2017 |
| Francis Galdo, | : | |
| Appellant | : | |

**BEFORE:** **HONORABLE P. KEVIN BROBSON, Judge**
**HONORABLE MICHAEL H. WOJCIK, Judge**
**HONORABLE DAN PELLEGRINI, Senior Judge**

**OPINION BY JUDGE BROBSON**        **FILED: March 28, 2018**

Francis Galdo (Galdo) appeals from an order of the Court of Common Pleas of Philadelphia County (trial court). The City of Philadelphia (City) filed a complaint against Galdo for continuing trespass, permanent trespass, and ejectment, and Galdo filed a counterclaim to quiet title, claiming ownership by adverse possession. Following a bench trial, the trial court found in favor of the City and ordered Galdo ejected from the disputed property. Galdo appeals from the trial court's order denying post-trial relief. For the reasons set forth below, we vacate the trial court's order and remand the matter for further proceedings.

## I.  BACKGROUND

Between the streets of Lee, Front, Wildey, and Girard Avenue in Philadelphia is a rectangular lot of undeveloped land (Property) that is the subject of the instant appeal. In July 1962, the City entered into an agreement with the Commonwealth of Pennsylvania (Commonwealth) to assist in the development of various state roads. (Reproduced Record (R.R.) at 922a-934a.) In furtherance of

that agreement, on November 13, 1974, the *City* obtained title to the Property by condemnation, in order to reroute the Elevated Frankfort train line (Elevated Frankfort) to provide additional space for construction of Interstate 95 (I-95). Then on January 19, 1976, the *Commonwealth* filed a notice of condemnation against several of the City's lots in the area, including the Property. The notice of condemnation indicated that the Commonwealth would permanently retain the land in the I-95 right-of-way, and that the Commonwealth would have a *temporary* easement on the Property for the period that the Elevated Frankfort was rerouted. The parties agree that the City has not physically occupied or provided any maintenance of the Property since the completion of the construction that rerouted the Elevated Frankfort in the late 1970s.

In September 1989, Galdo purchased his house on Lee Street, across from the Property. Shortly after purchasing the house, Galdo began using a portion of the Property that the parties refer to as the "Galdo Parcel." It appears that over the years, Galdo used the Galdo Parcel in a variety of ways, including for storage, parties, and parking. It also appears that he made various improvements or alterations to the Galdo Parcel, including, but not limited to, pouring concrete slabs, installing and (later) removing a fence, installing two large trailers for storage, building a fire pit/brick barbeque and pavilion, and creating a volleyball court, horseshoe pits, and treehouse.

On February 5, 2013, the City posted a public notice on the Property, notifying the public to remove all personal property within 30 days. Galdo refused to comply with the notices and removed them.

The City filed its ejectment action on April 24, 2014. Galdo responded with a counterclaim to quiet title, claiming ownership by virtue of adverse

2

possession. The parties filed cross-motions for summary judgment, and on February 24, 2016, the trial court, via the Honorable Nina W. Padilla, denied both motions. On March 24, 2016, the matter went to a bench trial, and on April 21, 2016, the trial court, via the Honorable Robert P. Coleman, issued findings of fact and conclusions of law, finding in favor of the City. The trial court determined that Galdo could not claim title to the Property because the City condemned it at the behest of the Commonwealth, and because claims of adverse possession cannot lie against the Commonwealth or its agents. The trial court further determined that Galdo could not sustain a claim for adverse possession against the City because the Property was devoted to public use. The trial court also rejected Galdo's argument that the City waived its immunity defense from suit because, according to the trial court, the City could and did raise it in a preliminary objection. Finally, the trial court held that the coordinate jurisdiction rule[1] did not apply because the standard for a motion for summary judgement is different from the standard in a civil trial.

Galdo filed a motion for post-trial relief, which the trial court denied on April 29, 2016. This appeal followed.

## II.    DISCUSSION

---

[1] "[U]nder the coordinate jurisdiction rule, judges of coordinate jurisdiction sitting in the same case should not overrule each other's decisions." *Riccio v. Am. Republic Ins. Co.*, 705 A.2d 422, 425 (Pa. 1997). The coordinate jurisdiction rule does not apply where the motions are of a different type and does not bar a judge on summary judgment from overruling another judge's decision on preliminary objections or judgment on the pleadings, even on an identical legal issue. *Garzella v. Borough of Dunmore*, 62 A.3d 486, 497 (Pa. Cmwlth.), *appeal denied*, 72 A.3d 605 (Pa. 2013).

On appeal,[2] Galdo argues that the trial court erred by determining that a claim of adverse possession cannot lie against the City for the Property because (1) the Property was dedicated to public use and (2) the City was an agent of the Commonwealth when it condemned the Property in the 1970s. Galdo argues that the trial court erred by determining that the City did not waive its immunity defense by not raising it in a new matter to Galdo's counterclaim. Galdo further argues that the coordinate jurisdiction rule prevented the trial court from finding the City immune, because another judge denied summary judgment to the City and the City presented no additional evidence after the summary judgment stage. Finally, Galdo argues that he met all the elements of adverse possession and, therefore, acquired title to the Galdo Parcel.

In response, the City argues that it was immune from a claim of adverse possession, both because it condemned the Property at the Commonwealth's behest and because it held the Property for public use. The City further argues that this Court should reject an adverse possession claim that is based on unlawful conduct and that the coordinate jurisdiction rule is inapplicable because the standard in a motion for summary judgment is distinct from the standard in a bench trial.

## A. Claims of Adverse Possession Against Municipalities

The primary issue in the instant appeal is whether a claim of adverse possession can lie against the City, a municipality, when the City's only use of the Property during the statutory period was to hold the Property for possible future sale. As mentioned above, the City seeks the protection that the Commonwealth enjoys

___

[2] "Our standard of review of a non-jury trial is to determine whether the findings of the trial court are supported by competent evidence, and whether an error of law was committed." *Swift v. Dep't of Transp.*, 937 A.2d 1162, 1167 n.5 (Pa. Cmwlth. 2007), *appeal denied*, 950 A.2d 270 (Pa. 2008).

from claims of adverse possession. The rule in Pennsylvania that "a claim of title by adverse possession does not lie against Commonwealth property," originates from the doctrine *nullum tempus occurrit regi*, which means "[t]ime does not run against the king." *Dep't of Transp. v. J. W. Bishop & Co.*, 439 A.2d 101, 103 (Pa. 1981). The General Assembly has codified the preclusion of claims of adverse possession against the Commonwealth:

> Nothing contained in this act shall be construed to give any title to any lands by a claim of title adverse to that of the Commonwealth of Pennsylvania, and no claim of title adverse to the Commonwealth of Pennsylvania shall be made or recorded under the provisions of this act.

Act of May 31, 1901, P.L. 352, 68 P.S. § 88.

In *Evans v. Erie County*, 66 Pa. 222 (1870), the Pennsylvania Supreme Court addressed adverse possession in the context of a fact pattern similar to the instant case. In *Evans*, the Borough of Erie brought an ejectment action against the defendant-possessor, James Evans, who, for over thirty-one years, adversely possessed a strip of land owned by the Borough. Our Supreme Court held that the Borough of Erie was susceptible to a claim of title by adverse possession. In so doing, the Court limited the *nullum tempus* doctrine to claims against the Commonwealth:

> That the Statute of Limitations runs against a county or other municipal corporation, we think cannot be doubted. The prerogative is that of the sovereign alone: *Nullum tempus occurrit reipublicae*. Her grantees, though artificial bodies created by her, are in the same category with natural persons.

5

*Evans,* 66 Pa. at 228.[3]   Because the doctrine was available to the sovereign (the Commonwealth) alone, the Supreme Court held that Evans successfully obtained title to the strip of land through adverse possession.  Thus, applying *Evans,* political subdivisions, such as counties, townships, municipalities, and boroughs, are not immune from claims of adverse possession, although the Commonwealth is.  *Torch v. Constantino,* 323 A.2d 278, 279 (Pa. Super. 1974).  Moreover, claims of title by adverse possession cannot be made against any entity, public or private, where the land in question is devoted to public use.  *Bruker v. Burgess & Town Council of Borough of Carlisle,* 102 A.2d 418, 422 (Pa. 1954); *Torch,* 323 A.2d at 279.

In concluding that Galdo could not claim title by adverse possession, the trial court relied upon the Superior Court's decision in *Torch* and our decision in *Lysicki v. Montour School District,* 701 A.2d 630 (Pa. Cmwlth. 1997).  Neither *Torch,* which concerned property determined to be held for public use, nor *Lysicki,* which concerned property determined to be held in furtherance of the Commonwealth's responsibility to provide education, however, support this conclusion.

In *Torch,* the Superior Court addressed the question of whether the twenty-one-year prescriptive period for adverse possession could run during the period that the county held the property for tax sale for the nonpayment of taxes. The Superior Court concluded that it could not.  While the litigants in *Torch* were private parties, the property in question was returned to Lackawanna County for a portion of the alleged prescriptive period.  Initially, the Superior Court noted that a claim of title by adverse possession *can* be asserted against political subdivisions,

---

[3] The Supreme Court swapped the word *regi*, meaning king, for *reipublicae*, meaning state. *Evans*, 66 Pa. at 228.

6

unless the land in question is devoted to public use. The Superior Court determined, however, that the prescriptive period was tolled in *Torch* during the time that the county held the disputed property because the county did so in furtherance of a mandate by the General Assembly. Specifically, the Superior Court explained that the legislature intended counties to collect "delinquent taxes as a trustee for the taxing district so that real estate does not lie fallow and that tax titles are so improved as to attract buyers and restore real estate to the tax lists." *Torch*, 323 A.2d at 281. Accordingly, the Superior Court held that the land was *devoted to public use* and, thus, the prescriptive period could not run against the county during that time.

In *Lysicki*, this Court reached a similar conclusion, though not through a public use theory. We held that property owners adjacent to school district property could not maintain a claim of adverse possession against the school district. This Court's holding relied on precedent in which our Supreme Court stated that "'[i]t is well established that the local school districts are merely agents of the Commonwealth to which the legislature has delegated authority *in order to fulfill the state's responsibility to provide public education*.'" *Lysicki*, 701 A.2d at 632 (emphasis added) (quoting *Pennsylvania Fed'n of Teachers v. Sch. Dist. of Philadelphia*, 484 A.2d 751, 753 (Pa. 1984)). We explained that because the school district was fulfilling the Commonwealth's responsibility, the school district fell under the Commonwealth's protection from claims of title by adverse possession. *Id.*; *see also Pennsylvania Fed'n of Teachers*, 484 A.2d at 753 (noting that through a "comprehensive legislative scheme governing the operation and administration of public education," the Commonwealth has granted "broad power" to school districts to act on behalf of the Commonwealth to educate public school students).

7

Seemingly due to this Court's description of a school district in *Lysicki* as an "agent of the Commonwealth," *Lysicki*, 701 A.2d at 632, the City appears to argue that *Lysicki* supports the proposition that adverse possession can never lie against political subdivisions because they are agents of the Commonwealth. That is a misreading of our holding in *Lysicki*. In holding that the school district in *Lysicki* was immune from adverse possession, this Court emphasized the reason that the school district held the land in question. We determined that the school district held the land in question in furtherance of the Commonwealth's constitutional responsibility to provide public education. Indeed, this Court in *Lysicki* quoted the Superior Court's determination in *Torch* that adverse possession "may be asserted" against political subdivisions. *Lysicki*, 701 A.2d at 632 (emphasis added) (quoting *Torch*, 323 A.2d at 279). The school district in *Lysicki* only received the Commonwealth's protection from adverse possession because it held the disputed land as part of its obligation, bestowed upon it by the Commonwealth, "'to fulfill the state's responsibility to provide public education.'" *Lysicki*, 701 A.2d at 632 (quoting *Pennsylvania Fed'n of Teachers*, 484 A.2d at 753). Particularly in light of the Supreme Court's holding in *Evans* that adverse possession can be asserted against political subdivisions, our holding in *Lysicki* did not provide *political subdivisions* with total immunity from claims of adverse possession. Instead, our holding is best understood as reiterating the *Commonwealth's* protection from adverse possession, including a situation where the Commonwealth obligates a school district to facilitate its constitutional duty to educate.[4]

---

[4] Both the City and the trial court contend that the City was an agent of the Commonwealth, and the City should receive the Commonwealth's protection from adverse possession, because the City condemned the Property at the Commonwealth's behest. There is a temporal reason to reject

8

Here, the lack of a legal obligation of the City to hold the Property distinguishes this case from *Torch* and *Lysicki*. While the parties dispute whether the City and the Commonwealth had formed an agency relationship, the holdings in *Lysicki* and *Torch* actually pertained primarily to the legal obligation of the political subdivision—the county in *Torch* and the school district in *Lysicki*—to hold the disputed property as the basis for the immunity from a claim of adverse possession. In *Torch*, it was the legislative mandate—that counties act as trustee, holding property for tax sale for the nonpayment of taxes—on which the Superior Court based its holding that the property was devoted to public use. *Torch*, 323 A.2d at 281. Likewise, in *Lysicki*, we explained that school districts hold and use school district property pursuant to the legal responsibility to provide education to public school students. *Lysicki*, 701 A.2d at 632; *Pennsylvania Fed'n of Teachers*, 484 A.2d at 753. The City does not provide any analogous obligation imposed by

---

the argument that the City should receive the Commonwealth's protection from adverse possession based on the condemnation. Even if the Commonwealth did direct the City for purposes of the expansion of I-95 and even if the City was at one point acting at the behest of the Commonwealth, the relationship for the agreement was temporary. It would not protect the City in perpetuity. In contrast to, for example, a school district's responsibility to educate, which does not cease to exist on any certain day, a construction project ends. Here, the parties agree that the expansion of I-95 was complete by the late 1970s and that the Commonwealth has had no involvement with the Property since. "The authority of an agent to perform a specified act or to accomplish a specified result terminates when the act is done or the result is accomplished." Restatement (Second) of Agency § 106 (1958). While the Supreme Court has not adopted this section of the Second Restatement of Agency, we are persuaded that an agency relationship necessarily terminates upon completion of the act for which the principal delegated authority in the first place. In this case, while the City may have condemned the Property at the Commonwealth's behest, it certainly did not hold the Property for decades at the Commonwealth's behest. Even if the City was able to establish an agency relationship based on its agreement with the Commonwealth, that relationship from that agreement would have ended when the Commonwealth completed the expansion of I-95 in the late 1970s.

law or evidence of any public use of the Property to justify holding and neglecting it for decades.[5] Furthermore, were we to determine that a municipality that condemns and holds previously private property for possible future sale did so for a public use, we would essentially hold that municipalities could institute a taking of private property for a land bank, keeping the property until the market provides a considerable profit upon its sale. Such a holding would be detrimental to private property rights. The City is not, therefore, immune from Galdo's counterclaim for adverse possession because it did not hold the Property pursuant to a legal obligation, or for public use.

The City does not cite to any case, nor is this Court aware of any, in which the Pennsylvania Supreme Court held that a claim of title by adverse possession cannot lie against municipal property, based solely on the municipality's status as a political subdivision. In fact, any determination by this Court to the contrary would be at odds with our Supreme Court's holding in *Evans*. *See Evans*, 66 Pa. at 228. Absent any legal authority to support the argument that the Supreme Court's holding in *Evans* is no longer good law, as an intermediate court, we are bound to apply its holding. Accordingly, the trial court erred by concluding that Galdo's counterclaim sounding in adverse possession could not lie against the City.

## B. Elements of Adverse Possession

---

[5] Our conclusion is also consistent with the application of the *nullum tempus* doctrine in a similar context—where a political subdivision initiates a suit and the applicable statute of limitations governs the initiation of the suit (as opposed to a prescriptive period, which is an element of Galdo's counterclaim). The Pennsylvania Supreme Court explained that the *nullum tempus* doctrine only applies to political subdivisions in such cases if "the cause of action accrues to them in their governmental capacity *and the suit is brought to enforce an obligation imposed by law*." *City of Philadelphia v. Holmes Elec. Protective Co. of Philadelphia*, 6 A.2d 884, 887 (1939) (emphasis added). The common denominator in *Lysicki* and *Torch* and the analogous line of cases, like *City of Philadelphia*, is the requirement that a legal obligation compels the political subdivision to proceed in a certain way.

Because this Court concludes that the City is not immune from an action for adverse possession, the only issue remaining is whether Galdo has established that he is entitled to adverse possession. Adverse possession is an extreme doctrine, which permits one to achieve ownership of another's property by operation of law. *Showalter v. Pantaleo*, 9 A.3d 233, 235 (Pa. Super. 2010), *appeal denied*, 20 A.3d 489 (Pa. 2011). One who claims title by adverse possession must prove actual, continuous, exclusive, visible, notorious, distinct, and hostile possession of the land for twenty-one years. *Baylor v. Soska*, 658 A.2d 743, 744 (Pa. 1995).

As discussed above, because the trial court made its decision based on Galdo's supposed inability to assert adverse possession against the City under the facts of this case, the trial court made no factual findings and reached no legal conclusions regarding the elements of Galdo's adverse possession claim. Thus, a remand is necessary so that the trial court may determine whether Galdo proved his entitlement to adverse possession.

## III. CONCLUSION

Accordingly, we must vacate the trial court's order and remand the matter to the trial court for further consideration of Galdo's claim of adverse possession.

P. KEVIN BROBSON, Judge

11

**IN THE COMMONWEALTH COURT OF PENNSYLVANIA**

City of Philadelphia              :
                                      :
           v.                :    No. 1953 C.D. 2016
                                        :
Francis Galdo,               :
                Appellant    :

# **O R D E R**

AND NOW, this 28th day of March, 2018, the order of the Court of Common Pleas of Philadelphia County is VACATED, and the matter is REMANDED for further proceedings consistent with this opinion.

Jurisdiction relinquished.

_____
P. KEVIN BROBSON, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

City of Philadelphia        :
                           :
      v.                 :  No. 1953 C.D. 2016
                           :  Argued: October 17, 2017
Francis Galdo,          :
          Appellant    :

BEFORE:   HONORABLE P. KEVIN BROBSON, Judge
                HONORABLE MICHAEL H. WOJCIK, Judge
                HONORABLE DAN PELLEGRINI, Senior Judge

DISSENTING OPINION BY
SENIOR JUDGE PELLEGRINI          FILED: March 28, 2018

The majority holds that Francis Galdo (Galdo) adversely possessed City of Philadelphia (City) property even though it was originally condemned at the behest of the Commonwealth for an indisputable public purpose and then, as was always envisioned, retained by the City for eventual disposition. I dissent because the City retained that property for a public purpose – *i.e.*, to offset governmental expenses and restore real estate to the City's tax assessment list. Just like the tax-sale property, I would hold that condemned property is immune from adverse possession so long as it was always retained for eventual disposition.

The pertinent facts of this case are best summarized by Galdo's counsel in his brief:

> In 1974[,] the City obtained record title to the Property by condemnation. Prior thereto, the City Council Committee of Public Property and Public Works held a hearing.

Therein, it was discussed that the Property was needed to provide land necessary for the construction of a temporary detour of the Frankford Elevated, **and thereafter the Property would be available for disposition once the permanent structure was complete and the temporary structure demolished**. It was also discussed that most of the land to be taken would be retained by the City and the City (not the Commonwealth) would ultimately pay for any lands it retained after construction was finished, which lands included the Property. It was further stated at the hearing that **there was no need for the Property after the Frankford Elevated was returned to its original location**.

\* \* \*

Since completion of the rerouting of the Market-Frankfort line in the 1970s, the City has not physically occupied the Property. Nor has it performed any maintenance, grass cutting, grading, or landscaping on the Property at any relevant time.

\* \* \*

It was not until February 5, 2013 that the City posted notices on the Property . . . all personal property be removed within thirty (30) days. Mr. Galdo refused to vacate the Galdo Parcel and instead removed the signs.

(Galdo's Brief at 11-12, 21) (emphasis added, citations and footnotes omitted).

Ultimately, in 2014, the City filed an ejectment and trespass action against Galdo, who in response filed a counterclaim for quiet title, contending that he adversely possessed the property. Relying in part on *Torch v. Constantino*, 323 A.2d 278, 281 (Pa. Super. 1974), the trial court held that Galdo could not sustain a claim for adverse possession against the property and found in favor of the City. The majority now vacates the trial court's order, concluding that the City's retention of

DRP - 2

the property for eventual resale does not constitute a "public use" because "were we to determine that a municipality that condemns and holds previously private property for possible future sale did so for a public use, we would essentially hold that municipalities could institute a taking of private property for a land bank, keeping the property until the market provides a considerable profit upon its sale." (Majority opinion at 10.)

In *Torch*, our Superior Court held that adverse possession does not run against a local government retaining tax-sale property for eventual disposition.[1] While the Court acknowledged that local governments do not enjoy blanket immunity from claims of adverse possession, it explained that an exception to this rule is that claims of title by adverse possession cannot be made against *any* entity – public or private – if the land in question is devoted to a public use/purpose. Focusing on the government's need to resell tax-sale property so as to generate revenue and return real estate to the tax list, the Court held that the retention of such property until its disposition constituted a public use meriting immunity from adverse possession.

In this case, it is undisputed that the property was always intended to be resold by the City after it served its initial public use. I see no reason why condemned property, when taken with the intent to resell, should be treated any different than tax-sale property. Similar to tax-sale property, a municipality's

---

[1] Since *Torch*, there have been a line of cases reiterating that adverse possession does not lie against land held by a non-state government entity when it is in connection with a tax sale. *See Fred E. Young, Inc. v. Brush Mountain Sportsmen's Association*, 697 A.2d 984, 992 (Pa. Super. 1997) ("Adverse possession does not lie against land held by the county in connection with a tax sale."); *see also Weible v. Wells*, 156 A.3d 1220, 1224-25 (Pa. Super.), *appeal denied*, 170 A.3d 1031 (Pa. 2017) (same).

retention of condemned property for eventual disposition serves the obvious goal of offsetting expenses otherwise incurred by its taxpayers.  That goal, however, can only be achieved if the title of condemned property remains "attractive to prospective purchases so that land owned by local government . . . can be more promptly sold and the land restored to the assessment lists." *Torch*, 323 A.2d at 280.

Accordingly, because the retention of condemned property for eventual disposition constitutes a public use, I respectfully dissent from the majority's opinion.

_____
DAN PELLEGRINI, Senior Judge