# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Carmen Carulli and Barbara Carulli,   :
husband and wife   :
  :   No. 1246 C.D. 2020
v.   :
  :   Argued: October 18, 2021
North Versailles Township Sanitary   :
Authority   :
  :
v.   :
  :
Port Vue Plumbing, Inc.,   :
               Appellant   :


BEFORE:   HONORABLE PATRICIA A. McCULLOUGH, Judge
             HONORABLE MICHAEL H. WOJCIK, Judge
             HONORABLE CHRISTINE FIZZANO CANNON, Judge


## _OPINION NOT REPORTED_

MEMORANDUM OPINION
BY JUDGE McCULLOUGH                FILED: October 4, 2022


This matter returns to this Court following our remand to the Court of Common Pleas of Allegheny County (trial court) in *Carulli v. North Versailles Township Sanitary Authority*, 216 A.3d 564 (Pa. Cmwlth. 2019) (*en banc*) (*Carulli I*). Port Vue Plumbing, Inc. (Port Vue) appeals the trial court's entry of judgment on October 28, 2020, awarding damages in the amount of $39,033.69 to the North Versailles Township (Township) Sanitary Authority (Authority), following a non-jury trial on the Authority's breach of contract claim against Port Vue. Following resolution of the matters disposed of in *Carulli I*, Port Vue challenges the trial court's application

of the doctrine of fraudulent concealment to toll the applicable statute of limitations, as well as the amount of the damages awarded. Upon review, we affirm.

## Background

As outlined in *Carulli I*:

In December 2002, the Authority contracted with Port Vue to replace terra cotta sewer pipes along Bevan Road in North Versailles Township. Port Vue agreed to replace the pipes using the "pipe bursting" method, which bursts the existing pipe while simultaneously pulling through a new pipe. The portion of sewer line to be replaced stretched from manhole 755 to manhole 767. Port Vue also contracted to excavate the new line to reconnect all residential sewer laterals to the new line. In July 2003, Port Vue notified the Authority that it had completed work on the project and requested final payment, which was approved by the Authority's engineer. In accordance with the contract, the Authority paid Port Vue for completion of the project.

In March 2012, the Authority was notified that the basement of a house along Bevan Road belonging to Carmen and Barbara Carulli (together, Carullis) had flooded with raw sewage. The Authority also discovered that manhole 767 was surcharged[2] to within several feet of its top. The Authority inspected the sewage lines with a camera and discovered that 112.71 lineal feet of piping between manhole 766 and manhole 767 had not been replaced in accordance with the contract. The Authority requested that Port Vue replace the sewer line between manhole 766 and manhole 767. When Port Vue refused, the Authority retained another contractor, State Pipe Services, to replace the old sewer line.

> [2]A "[s]ewer surcharge refers to the overloading of the sewer beyond its design capacity due to inflow and infiltration of water. A surcharging sewer often results in sewer overflow at manholes and customers' over flow relief gully[.]" Sewer Surcharge, The Local Government Municipal and Knowledge Base,

2

http://www.lgam.info/sewer-surcharge (last visited August 12, 2019).

In September 2012, the Carullis filed a complaint for damages against the Authority. In response, on or about November 20, 2012, the Authority filed a complaint to join Port Vue as an additional defendant arising from Port Vue's alleged failure to fulfill its obligations under the contract. The Carullis settled their claims, and the Authority and Port Vue proceeded to a non-jury trial.

*Carulli I*, 216 A.3d at 568 (record citations omitted).[1]

After trial, the trial court awarded the Authority $39,033.69 in damages resulting from Port Vue's failure to complete its obligations under the contract. Although the trial court recognized that Port Vue breached the contract in 2003 and that contract claims are governed by a four-year statute of limitations under 42 Pa.C.S. §5525(a)(1), the trial court applied the discovery rule[2] to conclude that, because the Authority did not learn of Port Vue's breach until March of 2012, the statute of limitations was tolled and the Authority's action against Port Vue was timely. This conclusion was the focus of Port Vue's appeal in *Carulli I*.

In *Carulli I*, this Court vacated the trial court's order. With regard to the statute of limitations, this Court first determined that the doctrine of *nullum tempus occurit regi* ("time does not run against the king") did not excuse the Authority from the applicable limitations period. *Carulli I*, 216 A.3d at 574-77. As for the discovery

---

[1] This Court's opinion in *Carulli I* additionally provided a detailed summary of the testimony offered at trial. *See Carulli I*, 216 A.3d at 568-72. The evidence that the trial court relied upon to support the legal conclusions at issue is highlighted *infra*.

[2] The "discovery rule" is a judicially created mechanism to toll a statute of limitations arising from "the inability of the injured, despite the exercise of due diligence, to know of the injury or its cause." *Pocono International Raceway, Inc. v. Pocono Produce, Inc.*, 468 A.2d 468, 471 (Pa. 1983) (emphasis omitted).

3

rule, this Court analyzed the jurisprudence of both Pennsylvania and other states, and emphasized that the Pennsylvania Supreme Court had yet to endorse the application of the discovery rule to claims for the breach of a written contract. *Carulli I*, 216 A.3d at 578-84. Absent such precedent, this Court declined to endorse the use of the discovery rule in this context. However, we noted that the Authority also had asserted that the applicable statute of limitations was tolled due to Port Vue's fraudulent concealment of its breach—a theory that the trial court, relying instead upon the discovery rule, had not addressed. *Id.* at 585-86. Because this determination implicated the trial court's function as the fact-finder, we remanded to the trial court "to issue a new decision determining whether Port Vue is estopped from asserting the statute of limitations as a defense to the Authority's claim under the doctrine of fraudulent concealment." *Id.* at 586.[3]

Following that remand, the trial court found that the testimony offered at trial supported the conclusion that Port Vue was estopped from asserting the statute of limitations under the doctrine of fraudulent concealment. The trial court highlighted the testimony of four witnesses: Donald Glenn, the owner of Glenn Engineering and Associates Ltd. (Glenn Engineering), who designed the project for the Authority; Joseph Dursa, a representative of Glenn Engineering who was on site conducting inspections of the project; Jack Gaffney, a representative of the Authority; and Richard Perkoski, the owner and president of Port Vue. In relevant part, the trial court emphasized:

---

[3] The present author dissented in *Carulli I*, opining that the trial court's existing factual findings were sufficient to apply the doctrine of fraudulent concealment, that the Court should therefore have refrained from deciding the broader question of whether the discovery rule can apply to breach of contract claims, and that, in any event, existing precedent supported the application of the discovery rule in the contract context. *Carulli I*, 216 A.3d at 586-89 (McCullough, J., dissenting).

4

It is undisputed [Port Vue] was paid for 100% of the contract in the summer of 2003. [Notes of Testimony, 11/21/2016 (N.T.) at 24; Reproduced Record (R.R.) at 104a.] This payment was made after **[Port Vue] sent an invoice to Glenn Engineering showing the project was 100% completed, which included the bursting of the entire line.** [N.T. at 25, 148-49, 171-72; R.R. at 105a, 228a-29a, 251a-52a.] The final payment application was sent to Glenn Engineering because it was the engineer's responsibility to make certain the contractor performed the work in accordance with the bid documents and was paid accordingly. [N.T. at 65; R.R. at 145a.] Donald Glenn approved the final payment to [Port Vue] based upon the final application for payment submitted by [Port Vue] **and oral representations from Mr. Perkoski that the line bursting had been completed.** [N.T. at 25-26, 58, 60; R.R. at 105a-06a, 138a, 140a.] Mr. Glenn and Mr. Perkoski had a good relationship and Mr. Glenn had **no reason to doubt whether the application was falsified or not completed**. [N.T. at 60; R.R. at 140a.] According to Mr. Glenn, Mr. Perkoski never informed him that the new line was 112.71 feet short of manhole CR 767. [N.T. at 60; R.R. at 140a.]

Mr. Dursa was on vacation when [Port Vue] supposedly completed the pipe bursting project. [N.T. at 25; R.R. at 105a.] Mr. Dursa recalled the air compressor broke on the machine used by [Port Vue] to perform the pipe bursting work the day he left for vacation and by the time he returned the machine was gone and [Port Vue] was no longer on site. [N.T. at 112-14, 121-23, 156; R.R. at 192a-94a, 201a-03a, 236a.] Mr. Dursa assumed the work had been completed while he was away and he had no further communication with [Port Vue] after that time. [N.T. at 121-23; R.R. at 201a-03a.] There would have been **no way for an inspector to visibly inspect the length of the sleeve that had been placed in the ground between manholes CR 764 and CR 767 because the pipe was [18 to 20 feet] deep and there was no excavation in that area.** [N.T. at 26; R.R. at 106a.] The excavation occurs primarily at the beginning of the job when the contractor has to make a hole to insert the liner. [N.T. at 26; R.R. at 106a.] At the time of completion of the project, **the Authority did not have the physical equipment to do an in-camera inspection of that portion**

5

**of the line that was not completed**.  [N.T. at 59, 201; R.R. at 139a, 281a.]  Mr. Gaffney testified he also believed the pipe bursting project was done in its entirety at 100%.  [N.T. at 201; R.R. at 281a.]

Mr. Perkoski admits the work was not completed in accordance with the bid documents, but he claims there was a verbal agreement with Mr. Glenn, Mr. Dursa[,] and Mr. Gaffney regarding substituting other work in lieu of completing the 112.71 feet of pipe in question.  [N.T. at 148-49, 151, 155-56, 165; R.R. at 228a-29a; 231a, 235a-36a, 245a.]  There is no change order to confirm the substitution of work or other evidence of any verbal agreement and Mr. Dursa, Mr. Glenn[,] and Mr. Gaffney all deny having any such agreement or discussion with Mr. Perkoski or anyone else from [Port Vue].  [N.T. at 33, 110-11; R.R. at 113a, 190a-91a.]  Mr. Perkoski acknowledged **the payment applications submitted by his company represent [that] 100% of the pipe bursting had been completed, even though 112.71 feet of piping had not been completed.**  [N.T. at 171-72, 176; R.R. at 251a-52a, 256a.]  Mr. Perkoski knew the Authority did not have additional funds approved to pay him for extras or for other work performed on the project.  [N.T. at 176, 190; R.R. at 256a, 270a.]  This [c]ourt noted Mr. Perkoski was generally evasive when answering questions about the alleged verbal agreement and why the payment applications were submitted with incorrect information.  [N.T. at 175-77; R.R. at 255a-57a.]

Trial Court Opinion at 3-5[4] (emphasis added).

The trial court found it significant that Port Vue continuously and falsely represented to the Authority that it had completed all of the work required under the contract.  *Id.* at 6.  The Authority relied upon Port Vue's representations, the trial court emphasized, because the Authority did not then possess the needed technology for video inspection of the work, and such video inspection was not a standard practice at

---

[4] Because the trial court's opinion is unpaginated, we have supplied page numbers for ease of reference.

6

the time. *Id.* Because the uncompleted work was underground, there was nothing apparent on the surface to indicate that Port Vue had failed to perform its obligations. *Id.* Port Vue was qualified for this sort of work and had successfully performed work for the Authority on prior occasions, so the trial court found that it was reasonable for the Authority to rely on Port Vue's representations. *Id.* In light of Port Vue's false representations, the trial court concluded that Port Vue's conduct amounted to fraudulent concealment of its breach of the contract, which served to estop Port Vue from asserting the statute of limitations against the Authority. **More specifically, "[a]fter reviewing the facts of record, [the trial court] conclude[d] the doctrine of fraudulent concealment applies to toll the statute of limitations until March of 2012 when the Authority became aware that [Port Vue] failed to complete the work as required by the contract**." *Id.* at 5. Accordingly, the trial court opined that the Authority's claim—which was filed in September 2012—was timely, and recommended that the November 22, 2016 verdict be upheld.

## Arguments

Port Vue again appeals the trial court's entry of judgment to this Court.[5] Primarily, Port Vue argues that the trial court erred in applying the doctrine of fraudulent concealment, such that the Authority's claim remains barred by the statute of limitations. Port Vue contends that the Authority had the opportunity to inspect the work that Port Vue was performing at the time, and thereby should have discovered that Port Vue failed to perform the necessary work. (Port Vue's Br. at 9-10.) Indeed,

---

[5] "When reviewing a non-jury verdict, our standard of review is limited to determining whether [substantial] evidence supports the trial court's findings of fact and whether the trial court committed an error of law." *Carulli I*, 216 A.3d at 572 n.4 (quoting *East Coast Paving & Sealcoating, Inc. v. North Allegheny School District*, 111 A.3d 220, 225 n.8 (Pa. Cmwlth. 2015)). "This Court must treat the trial court's findings of fact the same as this Court would treat a jury's findings of fact." *Id.* "This Court views the evidence in the light most favorable to the party that prevailed before the trial court." *Id.*

Port Vue suggests that such inspection was a contractual obligation of the Authority and its engineer, Glenn Engineering. *Id.* at 9 (citing Bid, Div. VI, Contract Provisions, art. 1, § 1.06(.2); R.R. at 363a). Port Vue stresses Mr. Glenn's testimony suggesting that one could determine that the pipes at issue were not replaced by climbing down a ladder in a manhole and shining a flashlight into the sewer, which, Port Vue suggests, the Authority should have done after Port Vue purported to complete its work. *Id.* at 10 (citing N.T. at 28, 56; R.R. at 108a, 136a). For precedential support, Port Vue cites *Fine v. Checcio*, 870 A.2d 850 (Pa. 2005), for the proposition that the same standard of "reasonable diligence" that is applied under the discovery rule also applies under the doctrine of fraudulent concealment. (Port Vue's Br. at 11.) Because Port Vue contends that the Authority was not reasonably diligent in inspecting Port Vue's work, the trial court erred in applying the doctrine of fraudulent concealment to toll the statute of limitations.

Separately, Port Vue argues that the trial court's damage award of $39,033.69 exceeded the amount of damages allowed by law. Port Vue cites *Trosky v. Civil Service Commission, City of Pittsburgh*, 652 A.2d 813, 817 (Pa. 1995), for the proposition that damages for a breach of contract are intended to protect either a party's "expectation interest," its "reliance interest," or its "restitution interest." (Port Vue's Br. at 13.) Expectation interest is protected by returning the injured party to "as good a position as he would have been had the contract been performed, that is, had there been no breach." *Trosky*, 652 A.2d at 817 (quoting Restatement (Second) of Contracts, Section 344, Comment a (American Law Institute 1981)). Reliance interest is protected by returning the injured party to "the position in which he would have been had the contract not been made." *Id.* Restitution interest is protected by requiring the

8

breaching party "to disgorge the benefit he has received by returning it to the party who conferred it." *Id.*

Port Vue contends that, applying these theories of recovery to the instant case, the trial court should have awarded no more than $14,351.00 in damages to the Authority. It reasons that, had the contract been performed, another 112 feet of pipe would have been burst and replaced. (Port Vue's Br. at 13.) Port Vue asserts that the cost of the work at the time was $127.00 per foot. *Id.* Thus, Port Vue argues that the value of the unfinished work was $14,351.00.[6] This figure, Port Vue suggests, represents the Authority's expectation interest, as well as the restitution damages— funds paid for work not performed. (*Id.* at 13-14.) Therefore, Port Vue asserts, any damages awarded to the Authority above that amount were excessive as a matter of law.

The Authority, by contrast, argues that the trial court was correct to deem Port Vue estopped from asserting the statute of limitations due to its fraudulent concealment of its breach. Citing *Deemer v. Weaver*, 187 A. 215, 216 (Pa. 1936), the Authority argues that, although mere silence on the part of the party to be estopped is not sufficient to invoke the doctrine, where the party takes affirmative actions to mislead, divert, or prevent discovery of the injury, the statute of limitations is tolled. (Authority's Br. at 9.) The doctrine applies where the defending party hides from the injured party any facts that would put the latter on notice of the injury or its cause. *Id.* (citing *Deemer*, 187 A. at 216). It is not the intention of the defending party that

---

[6] It is not wholly clear how Port Vue has arrived at this figure, inasmuch as 112 multiplied by $127.00 is $14,224.00. The more precise measurement of the uncompleted length of pipe—112.71 feet—multiplied by $127.00 is $14,314.17. Nonetheless, in broad strokes, it is apparent that Port Vue suggests that the appropriate measure of damages is the amount that it charged for the work that it did not complete.

matters, the Authority stresses, but rather the effect upon the injured party that gives rise to an estoppel. *Id.* (citing *Nesbitt v. Erie Coach Co.*, 204 A.2d 473, 477 (Pa. 1964)).

Here, the line bursting and pipe replacement project took place primarily underground, and any defects were not visible to the naked eye. *Id.* at 11. The Authority stresses that, **as the trial court found**, it lacked the capability at the time to inspect the underground work using cameras. *Id.* Although Port Vue places great emphasis upon the fact that physical inspection was possible, the Authority notes that such inspections are difficult and dangerous. *Id.* Per Mr. Gaffney's testimony, Occupational Safety and Health Administration (OSHA) standards require multiple people to be present on site when climbing down into a manhole due to the safety issues. *Id.* (citing N.T. at 199; R.R. at 279a). Accordingly, the Authority asserts that it was required to rely upon Port Vue's representation that it completed all of the work under the contract. Mr. Glenn explained that, because of his previous working relationship with Port Vue, he had no reason to doubt the veracity of Port Vue's representation about its work. *Id.* at 13 (citing N.T. at 60; R.R. at 140a). In light of the testimony that it highlights, the Authority maintains that, by submitting a falsified invoice certifying that it completed 100% of the work, Port Vue fraudulently concealed the fact that it did not in fact complete the project as required by the contract. *Id.* at 16. Thus, because the Authority had no reason to believe that Port Vue had not completed the work until the line collapsed in March of 2012, the Authority argues that the statute of limitations was tolled until that date, and that its claim against Port Vue was thus timely.

As for damages, the Authority argues that its expectation interest—the money expended to put the Authority in as good a place as if Port Vue had not breached the contract—includes the costs that the Authority incurred to complete the work that

10

Port Vue failed to perform. When the Authority became aware of Port Vue's breach in March of 2012, it notified Port Vue and gave it the opportunity to return to complete the work, but Port Vue refused. The Authority then contracted with State Pipe Services to finish Port Vue's work, incurring costs of $64,515.26. *Id.* at 19. The Authority further asserts that it expended an additional $25,080.28 for use of equipment and labor to remedy the backup of the sewer line into nearby residences, which the Authority argues was a natural result of Port Vue's breach. *Id.* at 19-20. The Authority notes that it proved these amounts to the trial court with verified business documents showing the amounts that it paid to have the project completed and to repair the damage. *Id.* at 20 (citing R.R. at 512a-29a). Thus, the Authority suggests that the correct amount of damages was $89,595.54, well in excess of both the $14,351.00 asserted by Port Vue and the $39,033.69 that the trial court awarded.

## Discussion

### I. Fraudulent Concealment

As our Supreme Court has explained:

> In addition to the discovery rule, the doctrine of fraudulent concealment serves to toll the running of the statute of limitations. The doctrine is based on a theory of estoppel, and provides that the defendant may not invoke the statute of limitations, if through fraud or concealment, he causes the plaintiff to relax his vigilance or deviate from his right of inquiry into the facts. *Deemer*, 187 A. at 215. The doctrine does not require fraud in the strictest sense encompassing an intent to deceive, but rather, fraud in the broadest sense, which includes an unintentional deception. *Id.* The plaintiff has the burden of proving fraudulent concealment by clear, precise, and convincing evidence. *Molineux v. Reed*, [532 A.2d 792, 794 (Pa. 1987)]. While it is for the court to determine whether an estoppel results from established facts, it is for the jury to say whether the remarks that are alleged to constitute the fraud or concealment were made. *Nesbitt*, 204 A.2d at 476.

11

****

> We are of the view [] that the standard of reasonable diligence, which is applied to the running of the statute of limitations when tolled under the discovery rule, also should apply when tolling takes place under the doctrine of fraudulent concealment. This is, we believe, the standard that will serve one of the overarching tenets in this area of our jurisprudence—the responsibility of a party who seeks to assert a cause of action against another to be reasonably diligent in informing himself of the facts upon which his recovery may be based. *Pocono International*, 468 A.2d at 471. Moreover, because the doctrine captures even unintentional conduct on a defendant's part and the standard of reasonable diligence requires from a party only that knowledge which is reasonably attained under the circumstances, we do not believe that deviation from that standard to a higher threshold of knowledge is warranted. Thus, we conclude that a statute of limitations that is tolled by virtue of fraudulent concealment begins to run when the injured party knows or reasonably should know of his injury and its cause.

*Fine*, 870 A.2d at 860-61.

We find no error in the trial court's reliance upon the doctrine of fraudulent concealment to deem Port Vue estopped from invoking the statute of limitations against the Authority. As noted above, the trial court supported its reasoning with a substantial amount of testimony from Mr. Glenn, Mr. Dursa, Mr. Gaffney, and Mr. Perkoski. In sum, this testimony established, and the trial court found, that Port Vue falsely represented to the Authority that it had completed 100% of the contracted work; that inspection of Port Vue's failure was difficult given the technology available to the Authority at the time; and that the Authority had no reason to suspect that Port Vue's representations were not truthful given the parties' previous professional relationship. Having weighed and considered the circumstances of this case, and based on its credibility determinations, the trial court determined that the

Authority first knew, or had reason to know, that the sewage lines Port Vue installed were faulty in March 2012, when the Authority was notified that the basement of a residence had been flooded with raw sewage. *See* Trial Court Opinion at 3-5.

Broadly speaking, Port Vue contends that its conduct "should not serve as the basis of fraudulent concealment." (Port Vue's Br. at 11.) However, **as the trial court found, Port Vue engaged in two affirmative misrepresentations; first, when Port Vue sent an invoice to Glenn Engineering showing the project was 100% completed**, **and second, when Mr. Perkoski made oral misrepresentations to Mr. Glenn that the line bursting had been completed.** Given the trial court's findings in this regard, the trial court correctly determined that Port Vue's affirmative misrepresentations caused the Authority "to relax [its] vigilance or deviate from [its] right of inquiry into the facts," and that Port Vue's conduct, as a matter of law, invokes application of the doctrine of fraudulent concealment. *Fine*, 870 A.2d at 860; *see also Nesbitt*, 204 A.2d at 477 (fraudulent concealment doctrine applied where "the agents of the defendant misled the plaintiff into believing" that a set of circumstances existed and "lulled her into a sense of false security"). Even if Port Vue's misrepresentation was not an intentional act of dishonesty, the doctrine does not necessitate proof of an "intent to deceive," but can apply equally to "unintentional deception." *Fine*, 870 A.2d at 860. Whether intentional or unintentional, such deception was present here, and the Authority reasonably relied upon it. *cf. Toy v. Metropolitan Life Insurance Co.*, 928 A.2d 186, 207 (Pa. 2007) (stating that "**the recipient of an allegedly fraudulent misrepresentation is under no duty to investigate its falsity in order to justifiably rely**"); *see also Amodeo v. Ryan Homes, Inc.*, 595 A.2d 1232, 1236-37 (Pa. Super. 1991) (concluding that **principles of estoppel prevent a party from raising a statute of limitations defense where the party agrees to perform a repair, represents to**

13

**the other party that the repair was performed, and the other party relied upon the representation**). And, in light of the trial court's findings of fact, this remains true regardless of any general oversight authority the contract may have granted Glenn Engineering. *Cf. Via Net v. TIG Insurance Co.*, 211 S.W.3d 310, 313 (Tex. 2006) ("Due diligence may include asking a contract partner for information needed to verify contractual performance. If a contracting party responds to such a request with false information, accrual may be delayed for fraudulent concealment."). As found by the trial court, false information, or fraudulent concealment, was exactly what occcurred here. In submitting its invoice to the township engineer and representing therein that it had completed 100% of the work, Port Vue misrepresented its completion of the work and the township reasonably relied thereon thus tolling the statute of limitations. Tellingly, the Dissent agrees that the doctrine of fraudulent concealment applies in this case, and only disputes the timing, efforts, and due diligence of the Authority, which, as explained below, are factual issues for the trial court to resolve.

On this note, the Dissent's position mirrors, in large part, Port Vue's arguments. Port Vue contends that "the Authority and/or its Engineer had an affirmative duty to determine whether the work was completed [and] failed to exercise reasonable diligence." (Port Vue's Br. at 12.) Somewhat similarly, Port Vue asserts that the Authority had an opportunity, or indeed, a contractual obligation, to inspect Port Vue's work and to learn of its breach at an earlier date.

In *Fine*, the Supreme Court ultimately determined that "the standard of reasonable diligence, which is applied to the running of the statute of limitations when tolled under the discovery rule, also should apply when tolling takes place under the doctrine of fraudulent concealment." *Id.* at 861. Reasonable diligence determines when an injured party should learn of his injury. Thus, the *Fine* Court held that "a

14

statute of limitations that is tolled by virtue of fraudulent concealment begins to run when the injured party knows or reasonably should know of his injury and its cause." *Id.* Importantly, under this standard, "the point at which the complaining party should reasonably be aware that he has suffered an injury is a factual issue best determined by the collective judgment, wisdom and experience of jurors," *i.e.*, the fact-finder, here, the trial court. *Crouse v. Cyclops Industries*, 745 A.2d 606, 611 (Pa. 2000) (internal citation and quotation marks omitted). "Thus, once the running of the statute of limitations is properly tolled, only where the facts are so clear that reasonable minds *cannot differ* may the commencement of the limitations period be determined as a matter of law." *Id.* (emphasis in original).

To be sure, the reasonable diligence inquiry is highly fact specific. "In order to determine when the statute should begin to run, the finder of fact focuses on whether the plaintiff was reasonably diligent in discovering his injury. Reasonable diligence is precisely that—a reasonable effort to discover the cause of an injury under the facts and circumstances present in the case." *Id.* Although the exercise of reasonable diligence can result in the discovery of pertinent facts, "**there must be some reason to awaken inquiry and direct diligence in the channel in which it would be successful,**" for "**[t]his is what is meant by *reasonable* diligence**." *Id.* (emphasis added). "In other words, **a party is not under an absolute duty to discover the cause of his injury. Instead, he must exercise only the level of diligence that a reasonable man would employ under the facts and circumstances presented in a particular case.**" *Id.* at 611-12 (emphasis added).

That said, it is not surprising that the courts of this Commonwealth have routinely reversed orders granting summary judgment based on the statute of limitations because, oftentimes, the fact-finder will have to weigh and resolve conflicts

15

in the evidence due to the presence of genuine issues of material fact with respect to the reasonable diligence standard. *See* 1 Pennsylvania Civil Practice §6.17 n.37 (collecting and discussing various cases). As an example, **in *Fine*, our Supreme Court noted that**, in reviewing a ruling on a motion for summary judgment, "the Superior Court [had] usurped the province of the jury, finding facts regarding [the doctor's] conduct that remain disputed," and especially stated that "**application of the doctrine of fraudulent concealment to toll the statute of limitations [was] an open question to be resolved at trial**." 870 A.2d at 863 & n.6 (emphasis added). In other words, it was within the province of the fact-finder, the trial court, and not this Court to find facts. Nonetheless, Port Vue argues the opposite of this because it essentially requests this Court to reconstrue the facts of this case and find that the Authority, exclusive of other contrary contractual provisions and representations that were made that the work was 100% completed, was contractually required to inspect the final portion of the work.

Specifically, Port Vue does not dispute the finding of fraudulent concealment but contends that the Authority had an opportunity to inspect Port Vue's work and to learn of its breach at an earlier date. Unveiled from its mask, this assertion of error is effectively a claim that the verdict is against the weight of the evidence, which is virtually incognizable on appeal. *See Commonwealth v. Champney*, 832 A.2d 403, 408 (Pa. 2003) ("The weight of the evidence is exclusively for the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. An appellate court cannot substitute its judgment for that of the finder of fact.") (internal citations omitted). Nonetheless, the Dissent credits Port Vue's argument fully.

16

Here, as the trial court emphasized and found, the camera technology that the Authority ultimately used to discover the breach was not available to it in 2003. Although there was some testimony suggesting that the Authority could have discovered the issue by having someone climb down into the nearest manhole and physically inspect the sewer line at issue, there was testimony indicating that this was difficult and dangerous. Moreover, **as the trial court found, it would have been impossible for Glenn Engineering to visibly inspect the final and unfinished portion of the project, because there was no excavation in that area, and the Authority did not have the physical equipment to do an in-camera inspection. Ultimately, as the fact-finder, the trial court was entitled to accept as credible the facts favorable to the Authority, consider and weigh them against any and all countervailing facts, and determine that the Authority exercised reasonable diligence under the circumstances.** *See Fine*.

While our standard of review requires this Court to view the evidence in light most favorable to the Authority as verdict winner, *Carulli I*, 216 A.3d at 572, the Dissent actually views it in the light most favorable to Port Vue. Despite its disclaimer to the contrary, the Dissent reweighs the evidence, substitutes its judgment for the fact-finder, and engages in fact-finding. In so doing, the Dissent determines that the Authority should have done that which the trial court, as the actual fact-finder, found it was excused from doing in the first place because Port Vue committed fraudulent concealment in misrepresenting that it completed the project when, in fact, it did not. *See Carulli v. North Versailles Township Sanitary Authority* (Pa. Cmwlth., No. 1246 C.D. 2020, filed October 4, 2022), slip op. at 13 (dissenting opinion) ("I merely observe that, under the facts of this case, as in any case involving the discovery rule or doctrine of fraudulent concealment, and possible tolling of the statute of limitations, the trial

17

court was required to consider when the Authority should have discovered the fraudulent concealment."); *id.* ("This Court does not find facts, but simply concludes that the trial court improperly failed to consider facts that are relevant to when, in the exercise of due diligence, the Authority should have known of the fraud."); *id.* at 14 ("The trial court failed to consider that the Township released funds without requiring completion of the scope of work, including the provision of the as-built drawings; that the negotiated terms of the public contract contained a plethora of opportunities to inspect the work, both during the progress of the work and upon completion, including requiring Port Vue to excavate and uncover the work if necessary; and that the Authority's engineer admitted that the work could also have been viewed by going down the manhole and using a flashlight.").

The above assertions ignore that the trial court did "consider facts that are relevant to" when the Authority should have discovered the fraudulent concealment by noting it was not possible for the Authority to climb down the hole, it did not have the camera equipment necessary to do so, and Port Vue represented it had completed 100% of the work. Moreover, such analysis, in essence, considers only isolated contractual terms and makes conclusions based on those alone, while disreading the contract when read a whole, flouting a fundamental tenet of contractual interpretation. *See Commonwealth ex rel. Kane v. UPMC*, 129 A.3d 441, 463-64 (Pa. 2015) (stating that "the entire contract should be read as a whole . . . to give effect to its true purpose . . . and all of its provisions"). Contrary to the position of Port Vue and the Dissent, the trial court properly considered all the circumstances of this case when issuing its credibility and weight determinations and factual findings. The trial court was well aware of the circumstances of the case and based on such, it determined that there was fraudulent concealment which prevented the Authority from knowing of the defect.

Further, **neither party raised any issue concerning the contractual provisions at the trial court level.**

In sum, the Dissent agrees with the finding of fraudulent concealment, but would engage in further fact finding contrary to the trial court. To us, it is simply incorrect for the Dissent to say that "[t]he trial court failed to consider that the Township released funds without requiring completion of the scope of work." *Carulli*, slip op. at 14 (dissenting opinion). There are several reasons why it was incorrect to do so. First, the Dissent's statement, in and of itself, contradicts the Dissent's acknowledgement that fraudulent concealment occurred here. It also ignores the trial court's findings that Port Vue submitted an invoice representing the work was 100% completed and made similar oral representations to Mr. Glenn. Moreover, the Dissent would find that the Authority could (and should) have gone down into the manhole, in total disregard of the trial court's finding that this would be an unreasonable and dangerous endeavor, and that the Authority did not have the necessary equipment to do so. In making such assertions, the Dissent is clearly engaged in fact-finding contrary to that of the trial court. Just because the Dissent disagrees with the trial court's findings, this is no basis for us to disturb or otherwise usurp the trial court's role as the fact-finder.

Port Vue and the Dissent also maintain that the Authority had an absolute and unconditional contractual obligation to discover the breach at an earlier date. These contentions are also unavailing, as a thorough examination of the entire contract clearly demonstrates otherwise.

With regard to the purported contractual obligation of the Authority to inspect Port Vue's work, Port Vue cites section 01.06.2 of the Contract Provisions, which provides:

19

> Engineer To Determine Date of Completion – The Engineer will conduct reviews to determine the dates of substantial completion and final completion, will receive and forward to the Owner for the Owner's review written warranties and related documents required by the contract and assembled by the Contractor, and will issue a final certificate for payment upon compliance with the requirement hereinafter set forth.

Bid, Div. VI, Contract Provisions, art. 1, §1.06(.2); R.R. at 363a.[7]

The language to which Port Vue apparently refers is the duty of Glenn Engineering to "conduct reviews to determine the dates of substantial completion and final completion" of the work. However, nowhere in this contractual language is it stated that the Authority was obligated to send someone to climb down every single manhole encompassed within the project and to inspect every foot of pipe required to be replaced, merely to verify that Port Vue was truthful in representing that it had completed the contracted work.

Signficantly, Port Vue's first express obligation under the contract makes clear that Glenn Engineering's review function did not in any way relieve Port Vue of its duty to perform the work that it contracted to complete:

> All work shall be done in strict accordance with the Contract Documents. Observations, construction reviews, tests, recommendations, or approvals by the Engineer or persons other than the Contractor **shall in no way relieve the Contractor of obligations to complete all work in accordance with the Contract Documents**

Bid, Div. VI, Contract Provisions, art. 3, §3.01(.1); R.R. at 365a (emphasis added).

---

[7] The "Engineer" referred to in the contract is Glenn Engineering, and the "Owner" is the Authority. Bid, Div. V, Scope of Work, Part 1.00, §1.05(01); R.R. at 346a ("All references to the Owner shall mean the 'North Versailles Township Sanitary Authority'. The Engineer shall be defined as the firm of Glenn Engineering and Associates, Ltd.").

20

Nonetheless, the Dissent faults the Authority for not requesting "final drawings" under the contract and determines that this was "the point in which the Authority, in the exercise of reasonable diligence, should have known that Port Vue fraudulently concealed that the project had not been completed to contract specifications." *Carulli*, slip op. at 4-5 (dissenting opinion). Moreover, this provision actually requires Port Vue to provide the "final drawing" to the Authority, and by no means does it place a contractual duty upon the Authority to inspect and/or approve the workmanship of Port Vue. *See* Bid, Div. IV, Contract Provisions, art. 4, §4.04(.01); R.R. at 352a ("The Contractor shall be responsible for supplying a clean and legible set of final drawings clearly showing the final position of all equipment or materials used in construction of the project. This set of drawings must be turned over to the Engineer and approved by the Owner before the final payment is released on the project. This drawing must be on the same data set as the existing drawing and a CAD.dwg file of the manholes supplied."). N.T. at 156, R.R. at 219a. Regardless, even if the Authority, upon inspection of the documents, may have been able to discover that the work was not completed, it is just as likely that Port Vue would have misrepresented on the drawings that the work was completed, which would put the Authority **in the same** position in which it finds itself today—the recipient of fraudulent misrepresentations.

Similarly, the Dissent refers to a section of the contract that vests Glenn Engineering with the right to conduct reviews of the project during its construction and upon completion to "find that the statute of limitations began to run anew upon the Authority's . . . failure to conduct the inspections." *Carulli*, slip op. at 14-15 (dissenting opinion). *See* Bid, Div. IV, Contract Provisions, art. 1, §1.02(.5); R.R. at 361a ("All materials and each part or detail of the work shall be subject at all times to

21

observation by the Engineer and the Owner, and the Contractor will be held strictly to the intent of the Contract Documents in regard to quality of materials, workmanship, and diligent execution of the contract.").

First, we note **the Authority was conducting inspections** until the very last one, when Glenn Engineering was informed by an agent of Port Vue that the work had been completed. (Trial Court opinion at 5-6.) Second, and perhaps more importantly, **as the trial court found, it would have been impossible for Glenn Engineering to visibly inspect the final and unfinished portion of the project, because there was no excavation in that area, and the Authority did not have the physical equipment to do an in-camera inspection.**

In any event, the Dissent parses this provision from the remainder of the contract and, in so doing, overlooks the various sections in the contract that state that **a review or inspection of the project by the Authority or its Engineer <u>does not resolve Port Vue from its obligations</u> to complete the contract and, further, <u>does not relinquish the Authority of its right to maintain suit against Port Vue</u>:**

> **3.04 <u>Supervision and Construction Procedures</u>**
>
> .1 . . . . Any **visits to the site** by the Engineer or the Owner, or their representatives, or the daily presence of the Resident Project Representative **shall not be construed as superintendence or supervision of the project**. It is also expressly understood that all superintendence or **supervision is provided by and is the sole responsibility of [Port Vue].**
>
> .4 **[Port Vue] shall not be relieved from obligations to perform the work in accordance with the Contract Documents either by the activities or duties of the Engineer in administration of the contract, or by review, tests, or approvals required or performed by persons other than [Port Vue].**

Bid, Div. IV, Contract Provisions, art. 3, §3.04(.1), (.4); R.R. at 368a.

**3.17 <u>Contractor Responsible Until Work Completed</u>**

. . . .

**.2 . . . <u>Neither the final certificate of payment nor any provision in the Contract Documents,</u> nor partial or entire occupancy of the premises by the Owner, <u>shall constitute an acceptance of work not done in accordance with the Contract Documents or relieve [Port Vue] of liability</u> in respect to any express warranties or responsibility for faulty materials or workmanship. . . .**

Bid, Div. IV, Contract Provisions, art. 3, §3.17(.2); R.R. at 377a.

**6.05 <u>Rights and Remdies</u>**

. . . .

**.2 <u>No action or failure to act by the Owner, Engineer,</u> or [Port Vue] <u>shall constitute a waiver of any right</u> or duty afforded any of them under the contract, <u>nor shall any such action or failure to act constitute an approval of or acquiescence in any breach</u> thereunder, except as may be specifically agreed in writing.**

Bid, Div. IV, Contract Provisions, art. 6, §6.05(.2); R.R. at 380a.

**6.07 <u>No Waiver of Rights</u>**

**.1 Neither the inspection by the Owner or Engineer, nor any order, measurement, or certificate by the Engineer, nor any order by the Owner for the payment of money, nor any payment for or acceptance of the whole or any part of the work by the Owner or Engineer or its employees, shall operate as a waiver of any provision of this contract, or of any power herein reserved to the Owner, or any right to damages herein provided nor shall**

**any waiver of any breach of this contract be held to be a waiver of any other or subsequent breach. . . .**

Bid, Div. IV, Contract Provisions, art. 6, §6.07(.1); R.R. at 381a.

In short, and contrary to the advocacy of the Dissent, there is no provision in the contract or the law that could serve as a basis to determine that the Authority had failed to exercise due diligence. Indeed, the above-noted provisions of the contract clearly indicate it was Port Vue's duty to properly supervise and completely perform its contractual obligations, and the Authority did not waive any rights in this regard. Instead, all the credited evidence of record substantiates the trial court's findings that Port Vue affirmatively misled the Authority into believing that the work was completed, thereby lulling the Authority into a false sense of security and a reasonable belief that it need not verify that Port Vue completed the contract. Simply put, the Authority did not incur an absolute and unconditional contractual legal obligation to inspect the work performed by Port Vue. In any event, to the extent that such a duty could be ascertained, it was merely one factor for the trial court to consider along with a variety of other factors to determine whether the Authority acted reasonably and exercised reasonable diligence under the circumstances. As noted above, Port Vue sent an invoice to Glenn Engineering showing the project was 100% completed, which included the bursting of the entire line; Mr. Glenn approved the final payment to Port Vue based upon the final application for payment submitted by Port Vue and oral representations from Mr. Perkoski that the line bursting had been completed; Mr. Glenn had no reason to doubt whether the application was falsified or not completed; there would have been no way for an inspector to visibly inspect the length of the sleeve that had been placed in the ground between manholes CR 764 and CR 767 because the pipe was 18 to 20 feet deep and there was no excavation in that area; and the Authority

24

did not have the physical equipment to do an in-camera inspection of that portion of the line that was not completed. On the current record, we discern no error in the trial court's performance of its fact-finding function.[8]

That said, we caution that our conclusion on this matter does not necessarily mean that the doctrine of fraudulent concealment becomes applicable in every situation in which one party to a contract falsely represents to the other that the contracted work is complete. In many situations, it may be obvious that work has not been performed as stated, or a rudimentary inspection may reveal the inaccuracy of such a representation. The instant case does not present such a circumstance. As the trial court found, the evidence in this matter established that the uncompleted work was located 18 to 20 feet underground and there was no excavation that would enable the Authority's personnel to inspect it. (N.T. at 26; R.R. at 106a.) Moreover, the Authority's witnesses testified that, at the time, they did not possess the camera equipment that would have allowed them to remotely inspect the subterranean portion of the line that Port Vue failed to complete. (N.T. at 59, 201-02; R.R. at 139a, 281a-82a.) Indeed, it is precisely because the discovery of Port Vue's breach would have

_____

[8] Respectfully, in an apparent attempt to impugn the trial court's factual findings, the Dissent also creates a heightened due diligence standard for governmental entities that enter public contracts to place a legal duty on the Authority to affirmatively discover the fact that Port Vue did not complete the project, even though, as the Dissent concedes, Port Vue engaged in fraudulent concealment when it misrepresented to the Authority that it had indeed completed all the work required under the contract. *See Caruli*, slip op. at 13 n.8 (dissenting opinion) ("I cannot agree with the Majority that the Authority had no duty to its taxpayers to inspect the work before it handed out taxpayer funds under a public contract."); *id*. at 14 ("In examining when the Authority in the exercise of reasonable diligence should have known the injury caused by Port Vue's insufficient work, the trial court erred in failing to recognize the Authority's failure to comply with its own obligations to taxpayers.").

Not only is this theory entirely novel and unfounded in the law, it is incongruous for the Dissent to wave a banner in the name of taxpayer money, when it would be the taxpayers who would ultimately have to pick up the tab for Port Vue's fraudulent concealment and breach of contract. Moreover, nothing in *Fine* compelled the trial court to apply a test that exceeded the standard of reasonable diligence.

been difficult if not impossible to discover that the Authority reasonably relied upon Port Vue's representations. The trial court's findings on this matter were supported by the evidence and establish a circumstance to which the application of the doctrine of fraudulent concealment is amply justified. Therefore, we conclude that the trial court did not err in applying the doctrine of fraudulent concealment to the facts that it found.

## II.    Damages

Port Vue's challenge to the amount of the damages awarded is likewise unpersuasive. Port Vue suggests that the absolute limit of the damages available to the Authority was the amount that Port Vue charged the Authority for the work that it failed to perform. This is incorrect as a matter of basic contract law.

Port Vue is correct that contract damages are traditionally awarded to protect an injured party's expectation interest, reliance interest, or restitution interest. *Trosky*, 652 A.2d at 817. However, the Authority's expectation interest was not merely the amount that it paid Port Vue for the uncompleted work, as Port Vue suggests. The Authority's expectation interest was the amount needed to put the Authority in "as good a position as [it] would have been had the contract been performed, that is, had there been no breach." *Id.* Had there been no breach, the Authority would have incurred no additional costs beyond what it paid Port Vue for the work. Instead, due to Port Vue's breach and its refusal to remedy it, the Authority was required to find another party to complete the work that Port Vue did not.

It is long-settled law that "[w]here the subject of a contract relates to building or construction, the measure of damages is the reasonable cost to the owner of completing the contract . . . ." *John Conti Co. v. Donovan*, 57 A.2d 872, 875 (Pa. 1948). "Pennsylvania courts . . . have generally allowed damages for incomplete or defective performance of a building contract to be measured by the cost of completing

26

the work or correcting the defects by another contractor." *Douglass v. Licciardi Construction Co., Inc.*, 562 A.2d 913, 915-16 (Pa. Super. 1989). In suggesting that the Authority was entitled only to a return of the funds that it paid it for the uncompleted work, Port Vue wholly neglects this measure of damages. Accordingly, Port Vue fails to demonstrate that the trial court's damage award was excessive.[9]

In light of all of the above, the order of the trial court is affirmed.

_____

PATRICIA A. McCULLOUGH, Judge

---

[9] We recognize that the Authority refers to costs that it incurred as a result of Port Vue's breach in excess of the $39,033.69 that the trial court awarded it. However, the Authority does not presently seek a greater damage award than it received, and instead argues only for affirmance of the trial court's order. Thus, at this juncture, we can merely state that Port Vue has not established that the damage award was excessive.

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Carmen Carulli and Barbara Carulli,    :
husband and wife    :
    :
    :
v.    :
    :   No. 1246 C.D. 2020
North Versailles Township Sanitary    :
Authority    :
    :
v.    :
    :
Port Vue Plumbing, Inc.,    :
    Appellant    :

## ***ORDER***

AND NOW, this 4th day of October, 2022, the October 28, 2020 entry of judgment by the Court of Common Pleas of Allegheny County is AFFIRMED.

_____
PATRICIA A. McCULLOUGH, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Carmen Carulli and Barbara Carulli,        :
husband and wife,                          :
                                           :
            v.                             :
                                           :
North Versailles Township                  :
Sanitary Authority                         :
                                           :
            v.                             :
                                           :
Port Vue Plumbing, Inc.,                   :    No. 1246 C.D. 2020
                       Appellant           :    Argued:  October 18, 2021


BEFORE:    HONORABLE PATRICIA A. McCULLOUGH, Judge
           HONORABLE MICHAEL H. WOJCIK, Judge
           HONORABLE CHRISTINE FIZZANO CANNON, Judge


OPINION NOT REPORTED

DISSENTING OPINION
BY JUDGE FIZZANO CANNON                     FILED:  October 4, 2022


            Respectfully, I dissent.  Our Supreme Court held in *Fine v. Checcio* that
"a statute of limitations that is tolled by virtue of fraudulent concealment begins to
run when the injured party knows or reasonably should know of his injury and its
cause."  870 A.2d 850, 861 (Pa. 2005).  While I agree with the Majority that the
doctrine of fraudulent concealment applies to the instant matter, the North Versailles
Township Sanitary Authority (Authority) had an obligation to protect the public,
whose funds were utilized to pay for the project, by exercising reasonable diligence
in accordance with the terms of the public contract.  The Court of Common Pleas of

Allegheny County (trial court) abused its discretion[1] by failing to consider the terms of the contract that was formulated for the benefit and protection of the public through a public bidding process. Accordingly, although I would affirm the trial court's conclusion that the doctrine of fraudulent concealment is applicable to toll the statute of limitations, I cannot agree with the Majority's extension of the statute of limitations, in complete disregard of the precedent of *Fine*, because, as a result, the Majority condones the disbursement of public funds in the face of a lack of any diligence, much less reasonable diligence, on the part of the Authority. Therefore, I would reverse the trial court's determination that the statute of limitations had not expired when this matter was filed. The statute of limitations did not first begin to run upon the flooding of residences with raw sewage in March of 2012, as the trial court determined, but rather, began to run when the Authority, in the exercise of reasonable diligence, should have known the work was not completed as required and that the contractor had fraudulently concealed its failure to fulfill the scope of work.

In *Fine*, our Supreme Court explained:

[R]easonable diligence is not an absolute standard, but is what is expected from a party who has been given reason to inform himself of the facts upon which his right to

---

[1] "Our standard of review of a non-jury trial is to determine whether the findings of the trial court are supported by [substantial] evidence, and whether an error of law was committed." *Slack v. Slack*, 256 A.3d 472, 477 (Pa. Cmwlth. 2021) (quoting *City of Philadelphia v. Galdo*, 181 A.3d 1289, 1291 n.2 (Pa. Cmwlth. 2018), *aff'd*, 217 A.3d 811 (Pa. 2019), and *Swift v. Dep't of Transp.*, 937 A.2d 1162, 1167 n.5 (Pa. Cmwlth. 2007)) (quotation marks omitted).

As the plaintiff in its joinder complaint against Port Vue Plumbing, Inc. (Port Vue), the North Versailles Sanitary Authority (Authority) had the burden of proving fraudulent concealment by clear, precise, and convincing evidence. *See Fine v. Checcio*, 870 A.2d 850, 860 (Pa. 2005) (citing *Molineux v. Reed*, 532 A.2d 792, 794 (Pa. 1987)). Whether estoppel arising from fraudulent concealment applies under a set of established facts is a question of law. *Fine*, 870 A.2d at 860.

recovery is premised. As we have stated: "There are [very] few facts which diligence cannot discover, but there must be some reason to awaken inquiry and direct diligence in the channel in which it would be successful. This is what is meant by reasonable diligence." *Crouse v. Cyclops Indus*[.], . . . 745 A.2d 606, 611 ([Pa.] 2000) (quoting *Deemer v. Weaver*, . . . 187 A. 215, 217 ([Pa.] 1936) (citation omitted)). Put another way, "the question in any given case is not, what did the plaintiff know of the injury done him? But, what might he have known, by the use of the means of information within his reach, with the vigilance the law requires of him?" *Scranton Gas & Water Co. v. Lackawanna Iron & Coal Co.*, . . . 31 A. 484, 485 . . . ([Pa.] 1895). While reasonable diligence is an objective test, "it is sufficiently flexible . . . to take into account the differences between persons and their capacity to meet certain situations and the circumstances confronting them at the time in question." *Crouse*, 745 A.2d at 611 (quotation omitted). Under this test, a party's actions are evaluated to determine whether he exhibited "those qualities of attention, knowledge, intelligence and judgment which society requires of its members for the protection of their own interest and the interest of others." *Id.*

. . . .

. . . [T]he standard of reasonable diligence, which is applied to the running of the statute of limitations when tolled under the discovery rule, also should apply when tolling takes place under the doctrine of fraudulent concealment. This is, we believe, the standard that will serve one of the overarching tenets in this area of our jurisprudence -- the responsibility of a party who seeks to assert a cause of action against another to be reasonably diligent in informing himself of the facts upon which his recovery may be based. *Pocono* [*Int'l Raceway, Inc. v. Pocono Produce, Inc.*, 468 A.2d 468, 471 (Pa. 1983)]. Moreover, because the doctrine captures even unintentional conduct on a defendant's part and the standard of reasonable diligence requires from a party only that knowledge which is reasonably attained under the circumstances, we do not believe that deviation from that

standard to a higher threshold of knowledge is warranted. Thus, we conclude that a statute of limitations that is tolled by virtue of fraudulent concealment begins to run when the injured party knows or reasonably should know of his injury and its cause.

*Fine*, 870 A.2d at 858 & 861 (additional quotation marks omitted).

Whether and when the statute of limitations began to run after the application of the fraudulent concealment doctrine is the exact question that must be addressed in resolving this matter. As observed above, and as will be discussed further below, a determination of the Authority's contractual obligation is a question of law. Moreover, although the trial court was the finder of fact responsible for determining the *weight* of the evidence, the record contains a number of critical facts the trial court *failed to consider*. I review them here, not to opine on their weight, but simply to highlight the inadequacy of the trial court's analysis.

First, the "Scope of Work" for this public project required that Port Vue Plumbing, Inc. (Port Vue) provide "As-Built" Drawings to the Authority clearly showing where the pipe bursting ended. The bid specifications provided, in pertinent part, as follows:

### "Record" or "As-Built" Drawings

The Contractor shall be responsible for supplying a clean and legible set of final drawings clearly showing the final position of all equipment or materials used in construction of the project. This set of drawings must be turned over to the Engineer and approved by the Owner before the final payment is released on the project. This drawing must be on the same data set as the existing drawing and a CAD.dwg file of the manholes supplied.

Bid, Div. V, Scope of Work, Part 4.00, § 4.04(.01); Reproduced Record (R.R.) at 352a. Thus, the Scope of Work could not be deemed completed, allowing for the disbursement of final payment under the contract, until these drawings were

provided by Port Vue to the Authority. *Id.* Despite this, the Authority's engineer never required or collected as-built drawings from Port Vue for the Authority's pre-payment review. *See* Notes of Testimony, Nov. 21, 2016 (N.T.) at 32-33; R.R. at 112a-13a. The Authority's engineer, Donald Glenn (Glenn), testified that under the contract, Port Vue was to furnish these as-built drawings. N.T. at 32; R.R. at 95a. He stated he did not personally request that Port Vue submit as-built drawings after the contract was completed but that the request "would have come from one of my other people at the office." *Id.* Glenn testified that, to his knowledge, Port Vue did not supply Glenn Engineering or the Authority with as-built drawings. N.T. at 32-33; R.R. at 95a-96a. The trial court erred by failing to identify the lack of as-built drawings as a failure by Port Vue to complete the scope of work for the project, precluding its entitlement to final payment. The trial court also erred by failing to identify the failure to provide as-built drawings as the point at which the Authority, in the exercise of reasonable diligence, should have known that Port Vue fraudulently concealed that the project had not been completed to contract specifications.

Based upon Port Vue's conduct, one might suppose that such drawings, if produced, may well have included further fraudulent concealment of the deficiency of the contractor's work. Nonetheless, it may have forced the contractor to memorialize any alleged excuse it had for failing to complete the scope of work that was included in the bid, despite the absence of any change orders. The Authority's failure to exercise its right to obtain these contractually required as-built drawings represents a failure to exercise reasonable diligence on behalf of taxpayers that could have revealed the shortcomings of the work.

Additionally, I note that, unlike a party to a private contract, the Authority did not have a right to waive terms included in the bid specifications after acceptance of those terms. As our Supreme Court has observed, "[t]he obvious intent of a public competitive bidding requirement is to secure public contracts for the use of the government or a governmental body at the lowest cost to the taxpayers." *Willman v. Children's Hosp. of Pittsburgh*, 479 A.2d 452, 456 (Pa. 1984). Further,

> [b]idding requirements are for the purpose of inviting competition, to guard against favoritism, improvidence, extravagance, fraud and corruption in the awarding of municipal contracts, and to secure the best work or supplies at the lowest price practicable, and are enacted for the benefit of property holders and taxpayers, and not for the benefit or enrichment of bidders, and should be so construed and administered as to accomplish such purpose fairly and reasonably with sole reference to the public interest.

*Yohe v. City of Lower Burrell*, 208 A.2d 847, 850 (Pa. 1965) (internal quotation marks omitted) (quoting 10 McQuillan, *Municipal Corporations* § 29.19, at 266-67 (3d ed. 1950)). "The statutory mandate of competitive bidding is grounded in sound public policy." *Hanisco v. Twp. of Warminster*, 41 A.3d 116, 123 (Pa. Cmwlth. 2012) (quoting *Philips Bros. Elec. Contractors, Inc. v. Pa. Tpk. Comm'n*, 960 A.2d 941, 945 (Pa. Cmwlth. 2008)).

> [I]t is the taxpaying citizen who provides the necessary funds and whose interest must be protected. Moreover, even if the purpose of an award is to benefit the public . . . , private negotiations between the party awarding the contract and a successful bidder through which the terms and conditions of the competitive bids are modified or changed, are not in keeping with the purpose of competitive bidding.

*Id.* (internal quotation marks, brackets, and citation omitted). Notwithstanding that the Authority was not provided as-built drawings pursuant to the terms of the contract, the exercise of reasonable diligence required it to ensure that the project was completed before releasing final payment of public funds to Port Vue.

The Authority did not have the power either to waive Port Vue's obligation to supply as-built drawings of the completed project or to excuse its own obligations to the taxpaying public to inspect the project's completion prior to issuing final payment. On the contrary, the Authority, through its engineer, had an obligation to conduct a final review to ensure actual completion of the project prior to verifying project completion for the purpose of subcontractor payment. *See* Bid, Div. VI, Contract Provisions, art. 1, § 1.06(.2); R.R. at 363a. No party disputes that this required inspection did not occur. Glenn expressly acknowledged the inspection requirement, but testified that, notwithstanding this obligation, he certified the completion of Port Vue's work without inspecting it. *See* N.T. at 53; R.R. at 133a.[2] In fact, the trial court specifically stated: "The final payment application was sent to Glenn Engineering because it was the engineer's responsibility to make certain the contractor performed the work in accordance with the bid documents and was paid accordingly." R.R at 72a.

Regarding this contractual obligation, the Majority states that

> [n]owhere in this contractual language is it stated that the Authority was obligated to send someone to climb down every single manhole encompassed within the project and to inspect every foot of pipe required to be replaced, merely to verify that Port Vue was truthful in representing that it had completed the work contracted for.

---

[2] Glenn acknowledged that neither he nor anyone from his office conducted any type of inspection before certifying completion of the job. N.T. at 53; R.R. at 133a.

*Carulli v. N. Versailles Twp. Sanitary Auth.* (Pa. Cmwlth., No. 1246 C.D. 2020, filed Oct. 4, 2022), slip op. (Maj. Op.) at 21. This observation misses the point. The Authority owed a duty *to the public* to exercise its rights under the contract, and the contract specifically called for inspections by the Authority's engineer *as the work progressed*. That means that the Authority had *a duty to taxpayers* to exercise its right to inspect when the excavation was open, manhole to manhole, as the work was performed. In fact, the contract itself underscored the importance of such inspections by giving the Authority the power to inspect the work even if the contractor had already finished the work and filled in the ground covering the pipes:

> The Engineer shall be furnished with every reasonable facility for ascertaining that the work is in accordance with the requirements and intentions of this contract; *even to the extent of uncovering or taking down portions of finished work*. Should this be deemed necessary and . . . should the work exposed or examined prove unsatisfactory, the uncovering, taking down and replacing in a satisfactory manner shall be at the expense of the Contractor.

Bid, Div. VI, Contract Provisions, art. 1, § 1.02(.1)(c); R.R. at 361a (emphasis added).

The parties here had options concerning the materials to be used and the inspection procedures to be followed, and they specified their agreed-upon choices in the contract. *See* Bid, Div. IX, Engineering Specifications; R.R. at 408a-85a. The contract provided that the engineer would be the Authority's representative during construction until final payment was due. Bid, Div. VI, Contract Provisions, art. 1, § 1.01(.2); R.R. at 353a. The contract further provided that *the engineer would visit the site at appropriate intervals to become familiar with the progress and quality of work. Id.* § 1.01(.4); R.R. at 353a. The contract required Port Vue to have

copies of the contract documents and an additional set of plans at the work site for use by the engineer and the Authority and further required observation of the work at all times by the engineer and the Authority. *Id.* § 1.01(.4-.5); R.R. at 353a; *see also* Bid, Div. VI, Contract Provisions, art. 3, § 3.11(.1); R.R. at 366a. Importantly, the Authority had the right under the contract to inspect the project as it was proceeding, including uncovering and examining completed portions of the work. *See* Bid, Div. VI, Contract Provisions, art. 1, § 1.02(.1)(c); R.R. at 361a. The trial court erred by failing to address the impact of all of the rights of inspection that the Authority had under the contract, as well as its failure to exercise those rights in the interest of taxpayers. These factors must be considered in determining whether the Authority exercised reasonable diligence.

The Majority disposes of Port Vue's argument that the Authority had a contractual obligation to inspect and, thus, discover its breach of contract earlier, by pointing to the trial court's findings that (1) camera technology needed to inspect the pipe work was not readily available to the Authority in 2003, and (2) sending someone down manholes to physically inspect the sewer line was difficult and dangerous. *See* Maj. Op. at 17. However, Glenn conceded during his testimony that the work could have been physically inspected at any time without the aid of any type of camera, although he qualified the concession by stating that "[i]t would take a lot of effort to do that," explaining that "[y]ou would have to climb down, get a flashlight, [and] shine it[.]"[3] N.T. at 56; R.R. at 136a. The trial court never addressed Glenn's admission that a visual inspection that included climbing into the manholes

_____

[3] While Glenn testified that, in the absence of camera equipment, one cannot physically inspect the entirety of the pipe sleeve placed between manholes because the pipe is 18-20 feet deep and there is no excavation the length of the pipe, he conceded that one could see the excavation at the beginning of the project and the sleeve at the end. N.T. at 25-26; R.R. at 105a-06a.

and shining flashlights up the pipes to confirm the liner was in place was certainly within the Authority's power and ability. *See* N.T. at 56; R.R. at 136a. Instead, the trial court simply reasoned that there would have been no way for an inspector to visibly inspect the length of the sleeve that had been placed in the ground between manholes CR 764 and CR 767 because the pipe was 18-20 feet deep and there was no excavation in that area. R.R. at 73a. However, as Glenn's admission established, the length of the line did not have to be seen from above through an excavation, but could be seen from within the manhole with a flashlight. That such physical inspection was possible is further confirmed by the fact that, after the pipe collapse that occasioned this action, the Authority ascertained the line collapse through both physical observation and the use of a camera. *See* N.T. at 28-29; R.R. at 108a-09a. The post-collapse "physical inspection" of the sewage line involved an individual physically climbing down a ladder into the manhole and then shining a flashlight up the sewer line to observe the collapsed terra cotta piping – the very process that could have been used to inspect the sewer line for completion. *See* N.T. at 28; R.R. at 108a. Thus, physical inspection of the pipeline to determine whether the piping sleeve had been inserted and attached to the manholes as contracted, even if perhaps inconvenient, was certainly possible. The trial court erred in failing to consider this express admission by the Authority.

Unlike the Majority, I do not view conducting a visual inspection of a pipeline by descending into a manhole as "difficult and dangerous." Maj. Op. at 17. On the contrary, where the contract empowered the Authority to confirm project completion prior to final payment, assuming camera equipment to aid in such an inspection was not yet readily available, and even appreciating that inspection of every foot of sewer pipe between manholes where surface digging had not occurred

would have presented practical logistical difficulties, I would hold that the Authority was obligated to the public, at a minimum, to conduct a visual inspection to confirm whether the sewer pipe sleeve had been extended to the manholes as contracted, which the Authority's own witness acknowledged would have been readily determinable by descending into manholes and shining flashlights into the sewer pipes. *See* N.T. at 56; R.R. at 136a. To hold otherwise would render the inspection requirements meaningless.

Further, to the extent that Occupational Safety and Health Administration (OSHA) standards would have required multiple persons to be present for an inspection that involved an individual physically descending into a manhole,[4] there was no evidence that such a requirement rendered a visual inspection so difficult or dangerous as to excuse the Authority of its contractual obligation to inspect. Presumably, a sewer authority is accustomed to sending individuals into manholes to inspect lines, and following OSHA standards would have ensured the safety of such an inspection. Further, and notably, the Authority knew at the time that it entered into the contract what capabilities it had for inspection and, presumably, did not obligate itself to inspections it could not conduct.

In addition, and significantly, even accepting, *arguendo*, the Majority's conclusion that the use of camera equipment and the descent of personnel into manholes for inspection were not feasible, the Authority still had the means, pursuant to the contract, to inspect the work as it progressed to verify the completion of the work. Further, as explained above, the Authority also had the power to compel the contractor to uncover finished portions of the work to facilitate inspection. *See* Bid, Div. VI, Contract Provisions, art. 1, § 1.02(.1)(c); R.R. at 361a.

---

[4] *See* N.T. at 199-200; R.R. at 279a-80a.

Moreover, Port Vue's false representation regarding the completion of the work did not obviate the Authority's responsibility to conduct the pre-final payment inspection. While I appreciate that, based on the parties' previous professional relationship, the Authority did not suspect that Port Vue's representations were not truthful,[5] the Authority still was obligated to protect taxpayers by inspecting the final work product and confirming the proper completion thereof, not simply taking the contractor's word that the work had been completed. If, in fact, "conducting a video inspection of a newly installed sewer line was not a standard practice at the time[,]" the Authority still had an obligation to the public to inspect using methods that were available and within the Authority's power. Trial Court's Opinion on Remand at 6; R.R. at 73.2a. As Glenn admitted,[6] a visual inspection that included climbing into the manholes and shining flashlights along the pipes or having the work uncovered to confirm the liner was in place was certainly within the Authority's power and ability. *See* N.T. at 56; R.R. at 136a. In fact, as explained above, such a visual inspection was actually employed in 2012 to inspect the sewer pipe post-collapse. *See* N.T. at 28; R.R. at 108a. It is undisputed that the Authority failed to employ this readily available inspection method, which would have confirmed, at a minimum, whether the pipe sleeve was connected to the

---

[5] *See* Maj. Op. at 12.

[6] "The statements of a third person may be considered the admissions of a party if they are bound to that party because of agency, joint or common interest, or having vouched for their credibility and impliedly asserted that fact by calling the third person as a witness." *Durkin v. Equine Clinics, Inc.*, 546 A.2d 665, 670 (Pa. Super. 1988) (citing *Zank v. W. Penn Power Co.*, 82 A.2d 554, 555 (Pa. Super. 1951)). A trial court abuses its discretion when it ignores a party's admission. *Rizzo v. Haines*, 555 A.2d 58, 69 (Pa. 1989) (citing *Silco Vending Co. v. Quinn*, 461 A.2d 1324, 1327 (Pa. Super. 1983)).

manholes, so as to fulfill the Authority's obligation to inspect and confirm the completion of the contracted work before releasing payment therefor.

As the *Fine* Court observed, there are few facts that cannot be discovered through reasonable diligence. 870 A.2d at 858 (first quoting *Crouse*, 745 A.2d at 611; and then quoting *Deemer*, 187 A. at 217). The requisite degree of diligence varies with the circumstances, depending on the information within the plaintiff's reach and the degree of vigilance the law requires of him. *Fine*, 870 A.2d at 858 (first quoting *Scranton Gas*, 31 A. at 485; and then citing *Crouse*, 745 A.2d at 611). Here, as explained above, the trial court's decision, contrary to our Supreme Court's analysis in *Fine*, failed to include consideration of the information that was within the Authority's reach, *i.e.*, its contractual authority to inspect the work, even by compelling the contractor to uncover the work if necessary. Also contrary to the requirements of *Fine*, the trial court failed to consider the degree of vigilance required of the Authority under the circumstances, where public money was being expended on the project and the specific contract at issue was formulated to provide the Authority with inspection rights that would have protected the taxpayers from the very kind of fraud that occurred.

Contrary to the Majority's mischaracterization, this opinion would not impose on government entities a heightened diligence requirement, nor would it create a new, universal legal duty of inspection.[7] Rather, this opinion seeks to apply a reasonable diligence standard that already exists in our legal precedent, as defined by our Supreme Court in *Fine*. I merely observe that, under the facts of this case, as in *any* case involving the discovery rule or doctrine of fraudulent concealment, and

---

[7] Nonetheless, I cannot agree with the Majority that the Authority had no duty to its taxpayers to inspect the work before it handed out taxpayer funds under a public contract.

possible tolling of the statute of limitations, the trial court was required to consider when the Authority should have discovered the fraudulent concealment. Requiring such an analysis does not mean that the Authority lacked recourse for Port Vue's fraudulent concealment. It merely requires that the claim against Port Vue had to be brought within the statute of limitations, which started to run when it should have known in the exercise of reasonable diligence that the work was not completed as required despite Port Vue's attempt to conceal that fact. This Court does not find facts, but simply concludes that the trial court improperly failed to consider facts that are relevant to when, in the exercise of reasonable diligence, the Authority should have known of the fraud. The trial court here abused its discretion when it failed to properly analyze that issue. The trial court failed to consider that North Versailles Township released funds without requiring completion of the scope of work, including the provision of the as-built drawings; that the negotiated terms of the public contract contained a plethora of opportunities to inspect the work, both during the progress of the work and upon completion, including requiring Port Vue to excavate and uncover the work if necessary; and that the Authority's engineer admitted that the work could also have been viewed by going down the manhole and using a flashlight.

In summary, while Port Vue's conduct was reprehensible and justified the invocation of the doctrine of fraudulent concealment, that conduct in no way prevented the Authority from exercising its own contractual rights and fulfilling its obligations to the public to inspect Port Vue's work or to obtain as-built drawings as part of the scope of the work. Complying with these obligations would have revealed the deficiencies of Port Vue's work, *i.e.*, that the terra cotta piping had not been replaced with sleeving as contracted to at least one manhole covered by the bid

specifications. In examining when the Authority in the exercise of reasonable diligence should have known the injury caused by Port Vue's insufficient work, the trial court erred in failing to recognize the Authority's failure to comply with its own obligations to taxpayers. Therefore, while I agree that the four-year statute of limitations was initially tolled in this matter by Port Vue's fraudulent concealment of its deficient work product, I would find that the statute of limitations began to run anew upon the Authority's failure to require the as-built drawings that may have revealed the deficiencies in Port Vue's work, or upon its failure to conduct the inspections that certainly would have exposed those deficiencies.[8]

Accordingly, I respectfully dissent.


_____
CHRISTINE FIZZANO CANNON, Judge

---

[8] Because this failure to inspect could have occurred at any time prior to final payment, I would set the date the statute of limitations began to run as the date of the Authority's final payment to Port Vue.